Case number 23-1173. Interstate Natural Gas Association of America petitioner versus Pipeline and Hazardous Materials Safety Administration and United States Department of Transportation. Mr. Morata for the petitioner, Mr. Springer for the respondents. Good morning Mr. Morata, we will hear from you. Thank you your honor and may it please the court. Sean Morata on behalf of the petitioner INGA. In the final rule at issue in this case PHMSA finalized approximately 275 standards. INGA supported and championed the adoption of approximately 270 of them. INGA is not anti-safety rather with respect to the five standards that are at issue in this case PHMSA failed to follow the mandates of both the Safety Act and the Administrative Procedure Act and for that reason those standards should be vacated in part and they should be remanded. I know we are challenging five standards, I know we have several arguments as to each standard so I want to try to give the court what we think is the easiest way through all five of them and that is the final cost analysis that PHMSA made in the final rule. Because for each standard at issue PHMSA either ignored the significant costs that we're putting on industry entirely or they incorrectly and inaccurately assumed that there would be no costs because they were simply codifying existing industry practice. Take for instance the corrosive constituent standard. Let me ask you a housekeeping procedural question. If we agree with you on any of the I guess substantive cost benefit challenges do we need to reach the kind of procedural challenges to the alleged failure to perform a complete preliminary regulatory impact assessment for that same standard? I don't think so Judge Wilkins particularly because when presumably if PHMSA goes back and re-notices these rules hopefully they would take the lessons that we put in our brief and give a full analysis. Now of course there would be a question on any subsequent petition for review whether I did a sufficient preliminary analysis but I do agree with you if you agreed with us on the substantive cost benefit analysis the point that I started out with you can and I think that's why that's the easiest way through the case because you can just say they didn't do this cost benefit analysis the way they should have vacate remand and then they can sort the rest of it out on remand if they choose to re-promulgate these standards. So you're saying we could avoid all of the procedural arguments not just the challenges to the preliminary cost benefit. That's right so we also have two arguments with respect to logical outgrowth and you could also avoid those again if you agreed with us on the substance of the cost benefit analysis and the problems on the cost benefit analysis as I pointed out are either that PHMSA assumed it was codifying agency practice and did not explain when industry said no we don't do it that way we swear we don't do it that way you really need to take account of the additional obligations you're putting on us or they just didn't mention it at all because and I think a lot of those sort of tie into the logical outgrowth because the reason it wasn't in the preliminary is because it wasn't noticed but I think they didn't put some things in the final even after changing them at GPAG and later points so that tends to be the problem so in corrosive gas for instance PHMSA assumed that there was monitoring that was taking place at every single entry point to a pipeline but yet at the GPAG JA415, 449, 443 industry came out across the board and said we do monitoring yes but we don't do monitoring at every single entry point we instead have a more dynamic a more graduated a more nuanced approach to monitoring which if you're going to make us monitor at every single entry point those are costs you have to take account of but yet in the final rule and in the final regulatory analysis PHMSA doubled down and said you're going to assume that there is monitoring at every entry I ask you about the stress corrosion crack segment phrase and you say that that has a they mean the same thing what I'll say is this Judge Walker if you want to throw me in the briar patch of saying that they mean the same thing and so don't worry about it it's really only three excavations throw me in that briar patch and we can lose on that basis but I do hope you put in the opinion so that way you know if another administration comes along they can be a stop from saying that no no actually that means nine okay I think that's our approach to that I mean we have as we explain our reply brief why we think that why are you using two different terms why didn't you go back they mean the same thing but if at the end of the day if they're going to stick by the opinion that it means three and this court agrees it means three then I think we're all kind of happy at the end of the day you do explain why you think it means nine sure it means nine because the industry has always understood the term SCCDA covered a segment to mean three excavations and industry has always understood each SCCDA segment to contain multiple covered segments so in other words each what was previously called an SCCDA segment would have in it the more defined term covered pipeline segment two or three so if you say there have to be you're basing that just on industry understanding there's I mean that is what that is what industry practice was up to that time and again like I don't want to fight too hard on this judge pan if if it truly means the same thing that we always thought it meant then we're sort of in agreement I think the problem is is that if we didn't challenge that and the court didn't rule on it it's not that I don't trust my friends who sit over here but of course they're not always going to be the administration and if they came along and said actually they mean different things and actually you have to do nine without a court opinion saying that I think it's going to be a lot different for regulated entities but but I don't want to fight too hard on no I understand but the basis of your argument is just industry understanding because I don't really see it was a previously undefined term that's correct and partly what I think where is the industry understanding factually in the record I think it comes from the comments I don't have a JAP tree that on judge on that judge Wilkins it was I think just sort of an understanding about pipeline operators were doing it previously because of course one of the things this final rule did and it did do with some respects is it codified existing practice the industry the problem is for these standards that we're talking about the other four standards PHMSA actually went a fair bit beyond existing industry practice and didn't take full account of the costs it was imposing but but I guess the bottom line is is your you are conceding that if the term means what PHMSA says in their brief that it means then then there's really no fight between us anymore challenges I think that's right judge Wilkins yes all right um with research sure ask about this severability question on c9 versus c and uh you know I I think I understand your argument uh I guess I have two questions one is about why they're well we should say this way why how would you be hurt if all of c9 were vacated so if all of c were vacated I think the problem would be that we would not have the ability to to you know all of these are ways you are going to address the dent and there's multiple ways you can do it and one of it is through this dent reassessment process where you can go out and do an assessment do an engineering analysis and say okay it's safe for now and we're going to come back and revisit in a certain period of time and that depends on the safety factor so if you take away all of c we don't have that process of it now judge walker I think sort of implicit in your question is would I rather lose on this argument or would I rather lose all of c get vacated I would rather all of c get big I guess I understand that's helpful to know yeah but on on which is the right course for us it seems possible that if if c1 through 8 and 10 tell you what to do and c9 says when to do it and then we take your proposal and just eliminate the mandate on when to do it right you won't ever be required to do it because you will never been told when to do it and that would render c1 through 8 and 10 a nullity I don't think it's a nullity judge walker because you know there are existing industry standards with respect to dent reassessment you know PIMSA wasn't writing on a blank slate so I think in the absence of c8 we continue to do it on things like a safety factor of two which is what the api standard was so I don't and also remember it's that we'd have to do it with respect if we're going to rely on to uh to carry out our our requirement to address death so we would still continue we would still continue to carry that forward why why wouldn't you just what what I guess if there were no c1 through 8 and 10 and you wanted to do an assessment how would that assessment look different than it would look under c1 through 8 and 10 well I don't think if I think if we didn't have c my understanding is that we wouldn't necessarily have the we'd have to address the dent in a different manner rather than through a dent assessment I think before the entire addressing of dents through this final rule we would do dent assessments and we would do them essentially the way they're done now we would just do them with a different safety factor I think also an area of costs where PIMSA fell short was on hferw the high frequency wells where PIMSA assumed that it that pipelines were already looking at these things and said that there was a particular manual that that required it this way we came in and said no the manual doesn't say that and they came back and said yes it does and as I understand my friend's argument on brief they say well now the manual doesn't matter any the manual matters quite a bit because that is the basis for which PIMSA said there were going to be no costs that come about this because you're doing it this way anyway so again much like the corrosive conditions it's PIMSA assuming that it's codifying existing practice and then not reasonably explaining why it was disagreeing with industry when industry came forward and said actually practice isn't like that at all and the problem at the end of the day is not so much because my friend focuses very much on the benefits of this rule but PIMSA has to take full account of the costs as well that's a general APA standard as but particularly standard under the safety act which requires explicitly a cost-benefit analysis unless the court has further questions Thank you for giving some time on the phone Mr. Springer we'll hear from you good morning your honor so may it please the court Brian Springer on behalf of the federal government PIMSA issued the final rule in this case after extensive input from the public and from the expert advisory committee I understand that there are a I'm happy to take the court's questions and be sure that we can be helpful so I think the very first thing you said about they issued the rule after how did you phrase it said extensive input your honor was that true for what they did in GPA midstream your honor in GPA midstream the problem that the court identified was that in sort of the preliminary rule and in the preliminary cost-benefit analysis there was no discussion at all or in the final rule as well of you know specifically that this application of this rule to an entire category of pipelines namely gathering pipelines and therefore that the public wasn't on notice that this was a change that PIMSA was contemplating am I remembering right that this rule was finalized before GPA midstream was published your honor this this rule was issued before the publication of GPA midstream would this rule have looked any different if you had the benefit of the GPA midstream opinion so your honor I don't want to speak to you know how the agency would change its practices and in response to GPA midstream um you know I think here that this this situation looks materially different than GPA midstream because the agency did specifically explain to the public the changes that it was contemplating there was a long back and forth process and I I take it that you know you didn't literally write the rule personally but you you are their counsel you're representing them right you're representing the agency you you work for DOJ and you're representing the agency I have this that's correct your honor right I I'm here on behalf of the agency that's correct and so if you know if you were advising them after let's imagine that this rule were a draft and then GPA midstream came out if you were advising them as their would you say we've learned something from GPA midstream and that that new knowledge should inform this rule in x y and z way your honor whether or not the agency in the future may you know be kind of more specific in certain instances here the agency did exactly what GPA midstream contemplated I know that's your brief and I'll ask one more time I don't want to dwell any more than I already have but I guess my kind of big picture question is what can you is there any reason to think the agency has learned anything from its defeat in GPA midstream your honor I think that the agency is making substantive changes I I I think that this specific cost benefit analysis that we have in this case looks materially different than the one that was at issue in GPA midstream in in ways that GPA midstream specifically described that the agency here went through the process of explaining what the costs were as to these different provisions and then did some quantification of the benefits on the other side which this court said was not the case in GPA midstream and that that is what informed the agency's ultimate decision to say that the benefits justified the costs in this particular case I appreciate it thank you so you haven't asked for a remand without vacator if we agree with the other side so if we do agree that the cost benefit analyses and the final analysis were inadequate it would be a full vacator your honor we haven't specifically asked for a remand without vacator I mean but I don't think we would resist the idea of remand without vacator at least as to some of the provisions but we haven't specifically asked for a vacator yeah that that isn't the relief that we've asked for in our brief your honor just to be clear follow up on judge pan's question in GPA midstream we vacated the rule but what we said was we were vacating only you know these specific standards that were challenged and we didn't try to go through and say that means you know section so and so is vacated but not the rest of the rule we said we left it to the agency to figure that out um I'm assuming when you say um if there were vacature in this case you would want us to do something similar here and not vacate everything that was promulgated in the rulemaking right so I want to make a couple clarifications I think in in general strokes that's correct your honor the first thing I just want to make sure is clear is that in GPA midstream because the problem was that the rule applied to an entire set of facilities that weren't discussed you know in the court's view in the earlier cost benefit analysis the vacator was as to those facilities as the gathering line specifically I think here if the court thought that there was some problem you know the other side hasn't challenged that it that they're the relief that they're seeking is specific to the provisions that they've challenged the one exception I just want to make sure is clear that I think has already been discussed this morning is that if the court has concerns in particular with the dent provision the safety factor provision that we would ask the court to vacate you know 712c in its entirety because the steps are one integrated process I think that question is I find that question hard and you might be right on it it seems a little bit odd for us to vacate parts of this rule that have not been challenged in this case and I'm not saying that there's a an absolute strict standing article three standing obstacle to us doing it but it does seem like severability doctrine is in something of a state of flux and part of the reason for that is it's just something a little bit uncomfortable about a petitioner saying I'm injured by c9 and I'm challenging c9 and a court saying we will take a red pencil or whatever the right metaphor is and we will just cross out all of c so your honor I think here the agency has identified practical problems that would result in it you know to the extent that the court thinks that there are problems with the safety factor piece the agency believes that it needs to reconsider the entirety of these steps that it has asked people to follow it may you know rejigger some of the steps it may change exactly what needs to be done because as your honor mentioned the the part that we're talking about is when to do something but that's all premised on the idea of what has happened beforehand and I would also just point this court to a recent severability decision of this court which is called board of county commissioners of weld county the epa it's 72 f 4 284 and at page 296 there's a specific discussion of severability of regulations that says if the agency believes you know that the sort of pieces need to rise and fall together that that's a reason to vacate sort of you know the pieces that that operate as a collective right I mean does the opinion say whatever the agency believes is true even if it's not true you know I think it says that that you know parts can can be severed unless the agency manifests an intent for the entire package to rise or fall together but here you know as as we've explained in our brief the agency you know believes that here you're saying you have manifested we have manifested that intent and I think we've also explained why the agency here thinks that these pieces are interconnected and need to be considered as one package particularly because as our brief mentioned and as is true there's sort of ongoing research in this area that the agency would need to look at in order to figure out you know exactly how it wants to calibrate this provision do you disagree with the petitioner when the petitioner says the rest of c would not be a nullity absent c now your honor I had a lot of knots in that question so a lot of negatives your honor it's a little confusing what c you would be doing you know in the absence of knowing when pipeline operators are supposed to go back and look at the dents um and as I mentioned the agency you know might sort of change some of the steps that the decision about when to look at it if it's using a different safety factor so these things all operate together um you know there'd be some practical problems of people that pipeline operators doing this process and notifying the agency and it's not clear kind of what the agency should be looking for and determining when you know these reassessments should be taking place I take that and I think maybe if I'm reading between the lines of their brief a little bit what maybe what they're worried about is if they win on c9 they might actually lose by winning because if we vacate all c c9 might get better but the rest of c you might decide to make it a lot worse and that's probably something that doesn't matter to us and impose a tax on them for their successful litigation is that something I think that's something that we probably should not worry about and I think you probably agree so can you tell me why sure yeah I don't think that that sort of consideration should enter into the balance here because the agency is making decisions about what's safe and what needs to be done to make sure that these dents don't cause problems down the road don't become so serious that you know in in the meantime there's some catastrophic event that happens so the agency needs the ability to set exactly what the steps should be and it may need to recalibrate those if there's some tweak in in some piece of this can't you do that even if we don't vacate all of c you could just issue a notice of proposed rulemaking and change things your honor I think the problem would be particularly the timing of how long it would take you know for that to come out because the agency has these processes that it has to go through including the advisory committee as well as notice and comment and so and as I mentioned before there has been research that that came out during the rulemaking and there's research that came out after the rulemaking that the agency would need to take into consideration I believe there's also continuing research that's going on so the agency would would you know need the opportunity to reconsider what to do here in entire universe of research so if we were just to vacate c9 and you went back to the drawing board on that you couldn't also unless we vacate the rest of c reconsider anything else in c your honor I think the the main problem would be the timing of what would happen in the interim while those other provisions you know the other pieces of c are still in effect because the agency has calibrated those provisions to what it did in c9 specifically so what would happen if we only vacate c9 your honor I think it's it's confusing to understand exactly what would happen because that is the provision that tells you when to go you know do this same set of steps over again to make sure that the dent hasn't gotten any worse um so I think that's exactly what the practical problem is that points up why to the extent that the court has you know thinks that there are that that's why the entirety of c should be the agency should have the opportunity to reconsider as one one collective and not have sort of just pieces of it in operation just having some trouble understanding why it matters if you can just try to make it more concrete for me uh yeah you're so what what steps sort of one through eight say is the steps that a pipeline operator needs to go through to look at a dent and assess how serious the dent is and then c9 says that you do sort of an additional analysis and you know make a decision based on the safety factor of when you're going to reassess and you notify the agency of of what you're doing and so it's unclear if people continue to notify the agency what the agency is actually looking for it's unclear that they've done enough steps ahead of time to the extent that we don't know when they're supposed to actually do this reassessment um you know of how this this is supposed to play out in practice because the agency was trying to standardize the process be the same whether we vacated or not are you saying that if we vacate c9 people aren't going to do it which is the same as vacating c i'm just trying to understand like actually on the ground what's going to change depending on this decision so you know i think what is going to change on the ground the the one important point is that this operates as an exception to an immediate repair condition so in general dents that have metal loss or cracking need to be repaired immediately there's there's some sort of more nuance there depending on how the dent is oriented um so and what the c process allows pipeline operators to do is go look at individual dents and delay their response if the dent is not so serious that it needs to be repaired immediately um so without this provision there would be sort of the more immediate repair would happen in the meantime which which is how this this process started to begin with and without c9 what would happen it would have c remains in place but c9 is gone your honor i think it's unclear exactly what would happen because it there wouldn't be a specific provision that tells industry you know pipeline operators when they have to go back and reassess the dents and in the meantime they'd be notifying the agency that they've done these assessments but that there's sort of no backstop on understanding when they have to go back and look at them again so i think that it would throw this process into disarray seems like in disarray either way i'm not sure that's true your honor i mean i think that without without the c process we would return to sort of what we had before um which is having the the pipeline operators immediately repair the dents that are covered by the provision instead of delaying their response to to make those repairs i have what i think is a quick corrosive constituent question corrosive constituents are by themselves harmless is that correct your honor it's correct that potentially corrosive constituents are you know some of them can be by themselves but in general they're they're not as a general matter it's correct that by themselves they are not problematic it's when they mix in with other things and what about water like like liquid water is that by itself harm that is keep them out the negative what liquid water is by itself not harm right your honor i don't know the answer specifically to that question i think water is one of the elements that's kind of the most potentially harmful especially when it gets added into a gas stream it's more likely to cause corrosion i don't know the specific answer of if you had just a pipeline that's only transporting water if that would be enough but but the the point of this provision is just to make sure that pipeline operators are being aware of what they're actually carrying and the makeup of it because sometimes when you introduce some of these elements like water or carbon dioxide it can cause a gas that wasn't corrosive to become corrosive that's helpful i appreciate it unless if you have any uh final points you wanted to make i know you were way late by questions i will give you a minute or two to summarize or make those points your honor i don't think i have anything else unless the court has questions um we would ask that the court deny the petition all right thank you thank you uh you're out of time mr mr murata but we'll give you two minutes thank you thank you your honor first judge walker i'd say you're exactly right about the timeline with respect to gpa midstream it makes sense that phimsa in this case made many of the same mistakes it did in gpa midstream because it didn't have gpa midstream available to it when it finalized the rule in this case um that's not a flaw that phimsa couldn't read the court's mind but it does show why gpa midstream warrants vacater of these standards second with respect to c9 c9 can be severed off because there are existing industry standards that tell you how long you take with respect to the safety factor and i do think you're right judge walker that when for instance you look at the recent affordable care act litigation there's real concerns about essentially expanding the notion the notion of what is going to be taken out of a statute or out of a rule just because there is one particular sub part of it so i think that's troublesome and i think you're also right judge pan that there is nothing that prevents phimsa when it goes back after vacater and says you know what if we're not going to be using safety factor 5 in the future then we got to take a look at everything else too when they reassess it they can reassess all of it and they can do that through their normal notice and common rule making procedures uh finally judge wilkins with respect to sccda the site is joint appendix 701 702 with respect to the reconsideration petition there is not a record with respect to what industry's understanding of sccda was because it goes to some of our notice problems with respect to it because that was in our view sprung on us after the notice and common process we didn't have the chance to make a record but as i've said to the court throughout if the court just wants to say they say the same thing we're fine with that result lastly judge walker we have the same understanding as our friends from phimsa with respect to water it's that water standing by itself is harmless we do agree that when it's mixed with gas and can become corrosive that's where the harm comes in and operators can and do monitor for that aggressively uh for instance when there's so-called wet gas that enters uh the pipeline that's what they're monitoring for they do keep an eye out for that as part of their dynamic monitoring processes unless the court has thank you your honor thank you we'll take the case under advised
judges: Wilkins, Walker, Pan